Filed 4/18/25  P. v. Flores CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B336143 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA103146) |
| v. | |
| ANTHONY FLORES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, William L. Sadler, Judge.  Affirmed.

Lenore De Vita, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Kenneth C. Byrne and Sophia A. Lecky, Deputy Attorneys General, for Plaintiff and Respondent.

————————————————

Defendant Anthony Flores spent a summer evening at Venice Beach with two friends and Kristian Ramos, a man he met that day through one of the friends. As the four men drank alcohol over several hours, Ramos became increasingly aggressive, initiating physical altercations with a stranger, and later with Flores and one of his friends. During the scuffle with Flores, Ramos repeatedly attacked Flores with his fists and Flores fought back, pushing Ramos to the ground multiple times. Each time, Ramos stood back up and continued his unprovoked attack on Flores. Eventually Flores pulled out a fishing knife that he routinely used for gutting fish and cutting open crabs. As the two men continued to scuffle, Ramos wound up on the ground and Flores inflicted three fatal wounds to Ramos's neck with the knife.

Flores was tried for voluntary manslaughter. He testified at trial and argued that he acted in reasonable self-defense. A jury rejected the defense and found him guilty. The trial court imposed and suspended execution of a three-year, lower term sentence and placed Flores on probation for three years.

Flores appeals from the judgment, contending insufficient evidence supports the voluntary manslaughter conviction. Specifically, he argues there is no substantial evidence demonstrating that he acted with the requisite mental state of intent to kill or conscious disregard for human life, or that he acted without a lawful excuse or justification (self-defense). Under the applicable substantial evidence standard of review, there is no cause to disturb the judgment and we affirm.

# BACKGROUND

## A. Prosecution Case

On August 23, 2020, the date of the events at issue, Jossue Lopez[1] and his friend Kristian Ramos met up with defendant Flores and his friend Colin Hendricks at Venice Beach. A few months before, a mutual friend introduced Flores to Lopez, and the two men regularly played online video games together but did not meet in person until the gathering at Venice Beach. Lopez and Ramos had been friends for years, but Lopez had disassociated from him in recent months due to Ramos's aggressive behavior while intoxicated. On two occasions within the previous year or two, Ramos punched Lopez for no apparent reason after drinking alcohol. Nonetheless, when Ramos asked Lopez to get together with him in the afternoon on August 23, 2020, Lopez agreed.[2] A short time later, Lopez received a message from Flores, inviting Lopez to join Flores and his friend at the beach.

When Lopez and Ramos arrived at Venice Beach between 4:00 and 4:30 p.m., they had already been drinking from a bottle of vodka Ramos had purchased. For the next few hours, they sat near a drum circle on the beach, drinking vodka, beer, and

---

[1] Lopez testified at trial for the prosecution, and during his testimony he provided the account of events described below, except as otherwise indicated by reference to another witness's trial testimony.

[2] When Lopez and Ramos met up that day, Ramos showed Lopez a photo of a mutual friend with bruised eyes and told Lopez he had inflicted the injuries the night before when the friend became out of control after drinking alcohol and Ramos had to calm him down.

3

alcoholic seltzer beverages with Flores and Hendricks.  Lopez observed that as the night wore on, Ramos's behavior became increasingly aggressive.  Knowing Ramos as he did, this aggressiveness indicated to Lopez that Ramos was intoxicated; but Lopez did not observe slurred speech or a lack of coordination on Ramos's part.

Eventually, the four men decided to go to a bar.  As they walked along the Venice Beach Boardwalk, Ramos punched a stranger, knocking the man to the ground, for reasons unknown to Lopez.  As Ramos walked away from the situation, the man stood up, pulled a gun from his bag, and pointed it at Lopez's face.  Neither the stranger nor Lopez said anything to one another.  Flores and Hendricks apologized to the man before he walked away.  Flores told Lopez that Ramos was "out of control" and had almost gotten Lopez killed.  Lopez expressed agreement with Flores's sentiments.  When Lopez caught up with Ramos, who had walked on ahead, Lopez asked him, " 'What the hell?  I almost died back there.' "  Ramos did not respond.

The group did not go to a bar.  Flores and Hendricks indicated that they wanted to drop off something at their car.  As the four men walked in the street toward the car, Ramos suddenly began punching Hendricks.  Flores intervened, telling Ramos, " 'hey man, get chill.' "  In response, Ramos "launched at" Flores, throwing punches at Flores's face.  Flores grabbed Ramos and threw him to the ground.  Ramos stood up, lunged at Flores, and continued attacking Flores with his fists.  Flores threw Ramos to the ground again.  All the while, Hendricks and Flores were asking Ramos to stop fighting and leave.  Lopez did not participate in the fight or intervene.  At some point he noticed that Flores's face was bleeding due to a punch inflicted by Ramos.

By this time, it was around 9:30 p.m. Lev Smagin[3] was in his apartment when he heard a verbal and physical altercation on the street. He looked out his window and observed four men, one of whom (later identified as Ramos) "got dropped to the ground" during the scuffle. Things "quieted down" after that, and Smagin moved away from the window. Within 10 to 15 seconds, the "screaming" started up again, and Smagin heard Ramos say, " 'I'm going to fuck him up.' " Smagin opened his front door and began recording the incident on his cell phone.[4]

According to Lopez's trial testimony, the video shows the last moments of the altercation, after Flores had already taken Ramos to the ground multiple times. Lopez identified Hendricks's voice on the recording saying, "Get out of here," and "I'm not fucking fighting with you," as Ramos pursued Hendricks and Hendricks tried to hold him off. Lopez identified Flores as the person who said, "Josh [Lopez], get your boy." Thereafter, Ramos said, "What's up fool?"

As shown in the video, at this point in the altercation, Ramos rushed toward Flores and Flores threw Ramos to the ground. Ramos stood up and continued swinging his fists at Flores. As the scuffle continued, Ramos fell back and Flores went

---

[3] Smagin testified at trial for the prosecution.

[4] During both Smagin's and Lopez's trial testimonies, the prosecutor played Smagin's cell phone video. The trial court admitted into evidence the video and a one-page written transcript of the words spoken between the four men during the video recording. The transcript is included in the record before us. We requested from the superior court and have reviewed all exhibits received into evidence at trial, including the cell phone video.

down with him. Lopez saw Ramos place his hand on his neck "immediately" after he went to the ground. As Ramos attempted to stand, he fell and removed his hand from his neck and blood started pouring out. Lopez rushed to Ramos's side. He never saw Flores or anyone else with a weapon.

Smagin never saw a weapon either. Nor did he observe the specific manner in which Flores inflicted Ramos's injuries.[5] Smagin exited his apartment and walked toward Ramos. He heard Ramos making strange noises as if he were gasping for breath. Smagin stopped recording on his cell phone and dialed 9-1-1. In addition to blood pouring out of Ramos's neck, he observed blood spilling from Ramos's mouth. He saw Flores flee from the scene.

At 9:32 p.m., immediately after the altercation concluded, Flores dialed 9-1-1. The trial court admitted into evidence an audio recording and a written transcript of the call. Flores told the 9-1-1 operator, "Hello, um. I just had to defend myself off 18th Street. Some guy was punching me. He was fucking crazy man. Gave me a bloody lip. Hit my friend, his own friend.[6] And I'm pretty sure he's dead." After confirming the location of the incident, the operator asked Flores if he needed a paramedic or an ambulance and Flores responded, "Paramedic." The operator instructed Flores to stay on the line to speak to a paramedic, but the call ended.

---

[5] Smagin was unable to make an in-court identification of the person who inflicted Ramos's injuries, but there was no dispute at trial that it was Flores.

[6] No witness testified at trial that Ramos hit Lopez during the altercation.

A first responder who testified at trial stated that Ramos showed no signs of life when first responders arrived at the scene. A deputy medical examiner who performed Ramos's autopsy testified that Ramos had eight "injuries by a sharp instrument" on his head, neck, and upper extremities.[7] He described the injuries as "incised wounds," which are longer than they are deep, like "surgical wounds." Three injuries to Ramos's neck were fatal and passed through his carotid artery and jugular vein. A fatal injury identified as wound number two was on the left side of Ramos's neck, just below his ear, and was around six inches long and one and three-eighths inches deep. It "incised arteries, veins and the trachea." Wound number four, also a fatal injury on the left side of Ramos's neck, was around five inches long and two to three inches deep. It "incised blood vessels and muscles." The deepest of the fatal injuries, wound number five, was on the right side of Ramos's face and neck and was around six inches long and three-and-a-half inches deep. It "incised muscles, nerves, blood vessels . . . and also the trachea." The deputy medical examiner testified that a nonfatal wound on Ramos's right forearm could be considered a "defensive wound," inflicted as "Ramos was trying to protect himself."

A toxicology report indicated that Ramos's blood alcohol content was 0.246, and he had marijuana in his system.

---

[7] The prosecutor introduced photos of Ramos's injuries and they were received into evidence.

7

## B.    Defense Case

Flores testified at trial.[8]  He stated that on August 23, 2020, his neighbor Hendricks, whom he had known for around five years, accepted his invitation to go to a drum circle at Venice Beach.  Flores brought with him a beach bag containing, among other things, a "Spyderco Salt" knife he had purchased two years before.[9]  In and around August 2020, he used that fishing knife about once a week for cutting fishing line, gutting fish, and cutting open crabs he caught.[10]  He acknowledged the knife was sharp and "could cut something fairly easily."  It did not require sharpening because it was designed to withstand the corrosive effects of salt water.

After arriving at the beach, Flores texted Lopez, his acquaintance of three months from an online video gaming community, and invited him to the drum circle.  When Lopez arrived at Venice Beach, he asked Flores if it was " 'cool' " that he brought his " 'old friend' " Ramos, and Flores responded, " 'Sure. The more the merrier.' "  Flores, Hendricks, Lopez, and Ramos

---

[8] To the extent Flores's testimony is repetitive of the account of events set forth above or is not pertinent to the resolution of his contentions on appeal, we do not summarize it here.

[9] The knife Flores used on Ramos was not recovered, but the prosecutor showed the jury a photo of a Spyderco Salt knife, and Flores confirmed it was the same type of knife he brought to the beach on August 23, 2020.

[10] Flores described the process of gutting a fish as "gilling and cutting, opening up the gills, taking off the fins, [and] taking off its stomach lining" by making an incision along the belly of the fish.  He also used the knife for cutting through bones of smaller fish to use as bait to catch larger fish.

drank alcohol for a few hours on the beach near the drum circle. The alcohol made Flores feel "buzzed" and "more relaxed," but he still felt like he was able "to control" himself. He did not observe Ramos slurring his words or lacking in coordination from the alcohol, but he noticed behavior by Ramos that he considered aggressive and "off-putting." For example, while watching a belly dancer perform at the drum circle, Ramos indicated he could get the woman to be with him by going up to her and grabbing her buttocks. In response, Flores and his friends said words to the effect of, "[N]ot really, dude. That's not how it usually works." On another occasion that evening, a man walked by and Ramos asked Flores, " 'Hey buddy, you want me to knock that fool out?' " Flores replied, " 'No, man. Why are you like talking about that? This isn't -- this isn't the place for that.' "

After leaving the drum circle, Flores, Hendricks, Lopez, and Ramos decided to go to a bar. Along the way, Lopez stopped to buy pizza. As the others were waiting for Lopez on the boardwalk, Ramos approached two women who were walking behind a group of men. One of the men walked toward Ramos, and Ramos punched him in the face, knocking him back. The man turned around, reached into a bag, pulled out a gun, and pointed it at Lopez, who had just caught up with the rest of the group. Flores talked to the man and deescalated the situation as Ramos walked on ahead. The man left the area.

Flores wanted to avoid any further trouble that might arise from hanging out with Ramos and Lopez. He pulled Hendricks aside and suggested they walk toward their car, which was parked nearby, and leave Venice Beach instead of going to the bar. Ramos and Lopez walked with them. As they made their way to the car, Ramos initiated a physical altercation with

9

Hendricks and Flores that lasted six to eight minutes, until Ramos was incapacitated.

First, Ramos attacked Hendricks, punching him with his fists, and Hendricks fought back. Next, Flores attempted to break up the fight, and Ramos redirected his attack toward Flores. As the two men traded punches, Flores grabbed Ramos and put him on the ground. When Flores let go, Ramos stood up and resumed his attack on both Flores and Hendricks. The fight continued in this manner as Flores and Hendricks edged closer to the car. Flores brought Ramos to the ground multiple times, and Ramos repeatedly stood up and charged at Flores or Hendricks, who both implored Ramos to stop fighting with them. Throughout the altercation, Ramos taunted Flores by saying, " 'What's up, fool' " asking him where he was from, and calling him " 'Antonio' " instead of Anthony.

The scuffle continued after they arrived at the car. At that point, Flores and Hendricks "pinned" Ramos to the ground, each securing one of his arms and demanding that he stop. Ramos told them, " 'Okay, okay. I'm cool. I'm cool. I'm cool.' " So they released him, and Lopez and Hendricks talked to him, while Flores stood apart from the group. Flores estimated that Ramos had landed around 50 punches to Flores's ribs, face, and the side of his head. Flores sustained a split lip and bruising on his lip, nose, and around his eyes.[11] He was concerned he had a broken nose and a serious eye injury from the blows to his face (but apparently, he had neither).

---

[11] The prosecutor introduced photos of Flores's injuries, taken by a detective after his arrest, and they were received into evidence.

Flores stepped toward the car. Ramos addressed Flores, asking if they were " 'cool,' " as he gradually moved toward him. Flores said they were " 'cool,' " but indicated he wanted Ramos to stay away from him. When Ramos was close enough, he reached out to Flores as if he were going to hug him and "sucker punch[ed]" Flores on the nose. Just after that, Smagin's cell phone video recording begins.

As shown at the outset of the video, Ramos was pursuing Hendricks and swinging his fists at him, Hendricks was trying to fight him off, and Hendricks and Flores were telling Ramos to stop. Ramos turned to Flores and said, "What's up, fool?" Flores testified that at this point, he pulled out his fishing knife, opened it so the blade was exposed, and held it in front of him where he believed Ramos could see it.[12] He felt "terrified" by Ramos's "relentless" attack and "wanted it all to stop." He did not have prior experience with fist fights, and he perceived Ramos as someone who had a broader build and was more muscular than he.[13]

Ramos ran at Flores and Flores threw him to the ground. Ramos stood up and started punching Flores. As Flores pushed Ramos away, Ramos fell and "dragged [Flores] down with him." Flores landed on top of Ramos, with his knees around Ramos's torso. Ramos continued moving while he was on the ground, swinging at Flores and attempting to grab him. Flores placed the knife on Ramos's neck and "applied pressure three times" to "tr[y]

---

[12] As mentioned above, neither Lopez nor Smagin ever saw the knife; and it is not visible in Smagin's cell phone video.

[13] Flores weighed around 220 pounds when the altercation with Ramos occurred.

11

to make him stop." He acknowledged that he cut into Ramos's neck three separate times (and also inflicted injuries on Ramos's forearms with the knife). He testified that it was not his intention to cut or stab Ramos, although he knew if he placed the knife on Ramos's neck and applied pressure the knife would cut into Ramos's neck.

Flores stood up "[a]s soon as [he] saw blood." He knew he had inflicted life-threatening injuries. He walked away and immediately dialed 9-1-1 to request help. Then, he went to the beach and rinsed off in the ocean. He slept on the beach and went home in the morning. Law enforcement arrived at his home shortly after he did and arrested him.

Flores submitted to an hour-long interview with detectives. He told them he acted as he did because he " 'had to take back control' " and stop Ramos. He testified that he also told detectives he was in shock, in pain, and feared for his life during the altercation.

## C.    Verdicts and Sentencing

The jury found Flores guilty of voluntary manslaughter (Pen. Code,[14] § 192, subd. (a) [sudden quarrel or heat of passion]) and found true the allegation that he personally used a deadly and dangerous weapon, a knife, in the commission of the offense (§ 12022, subd. (b)(1)).

The trial court sentenced Flores to the low term of three years in state prison for the offense. In accord with the prosecution's recommendation, the court suspended execution of sentence and placed Flores on probation for three years with

---

[14] Undesignated statutory references are to the Penal Code.

12

terms and conditions, including that he participate in anger management and psychological counseling for 52 weeks, and that he serve 365 days in county jail. The court awarded Flores 707 days of presentence credit.

## DISCUSSION

Flores contends his conviction for voluntary manslaughter must be reversed because the evidence presented at trial was insufficient to prove beyond a reasonable doubt (1) that he acted with intent to kill or conscious disregard for life, or (2) that he acted without a lawful excuse or justification (self-defense).

## A.     Substantial Evidence Standard of Review

"It is the prosecution's burden in a criminal case to prove every element of a crime beyond a reasonable doubt. [Citation.] To determine whether the prosecution has introduced sufficient evidence to meet this burden, courts apply the 'substantial evidence' test." (*People v. Cuevas* (1995) 12 Cal.4th 252, 260.)

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any

13

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.] . . . ' " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' " ' " (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

We " ' "must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Smith* (2005) 37 Cal.4th 733, 739.) "The credibility of witnesses and the weight accorded the evidence are matters within the province of the trier of fact." (*People v. Ramos* (2004) 121 Cal.App.4th 1194, 1207.) " 'An appellate court must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise.' " (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419.) "Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

**B.    The Record Includes Substantial Evidence Supporting a Finding That Flores Acted With Conscious Disregard for Human Life**

**1.    *Jury instructions and other applicable law***

A defendant who commits an unlawful homicide with intent to kill or conscious disregard for human life is guilty of voluntary manslaughter if the defendant acted upon a sudden

14

quarrel or heat of passion. (*People v. Lasko* (2000) 23 Cal.4th 101, 108-109 (*Lasko*), citing § 192, subd. (a).) Using CALCRIM No. 572, the trial court instructed the jury, in pertinent part, that it could not find Flores guilty of voluntary manslaughter unless the People proved beyond a reasonable doubt that he acted with intent to kill or with conscious disregard for human life.

The mental state of conscious disregard for human life for voluntary manslaughter is established " 'when [a] killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for human life.' " (*Lasko*, *supra*, 23 Cal.4th at p. 107; *People v. Cook* (2006) 39 Cal.4th 566, 596; see CALCRIM No. 572.) As the trial court also instructed the jury, a defendant's intent or mental state "may be proved by circumstantial evidence." (CALCRIM No. 225.)

In reviewing the sufficiency of the evidence of Flores's mental state, we focus on conscious disregard for human life. Because we conclude substantial evidence supports a finding that Flores acted with conscious disregard for human life, we need not review whether the evidence also demonstrates he acted with intent to kill.

### 2. *Analysis*

Viewing the evidence in the light most favorable to the judgment, as we must, sufficient evidence supports a finding that Flores acted in conscious disregard for human life when he killed Ramos. Substantial evidence demonstrates Flores placed the knife on Ramos's neck and applied pressure three times, knowing when he did so that the knife would cut into Ramos's neck. Flores was aware that the fishing knife was sharp and would

15

slice flesh easily, as he routinely used it for gutting fish and cutting through crab shells. He applied enough pressure to incise Ramos's carotid artery, jugular vein, trachea, and neck muscles, as he inflicted fatal wounds on both the left and right sides of Ramos's neck. Substantial evidence demonstrates Flores knew he was endangering Ramos's life when he intentionally and deliberately pushed a sharp knife into Ramos's neck, and he proceeded to do so three separate times in conscious disregard of Ramos's life.

## C. The Record Includes Substantial Evidence Supporting a Finding That Flores Did Not Act in Reasonable Self-Defense

### 1. *Jury instructions and other applicable law*

As the trial court instructed the jury to prove Flores was guilty of voluntary manslaughter, one of the elements the prosecution had to prove beyond a reasonable doubt was that Flores "killed without lawful excuse or justification." (CALCRIM No. 572.) One such justification is "lawful self-defense or defense of another." (CALCRIM No. 505.)[15] Where there is evidence supporting the defense, the "prosecution has the burden to prove a defendant did not act in self-defense, because self-defense negates an element of the offense." (*People v. Saavedra* (2007)

---

[15] "[W]hen a defendant, acting with conscious disregard for life, unintentionally kills in *unreasonable* self-defense, the killing is voluntary" manslaughter, a killing without lawful justification. (*People v. Blakeley* (2000) 23 Cal.4th 82, 91, italics added.) A defendant acts in unreasonable self-defense when the defendant has an "unreasonable but good faith belief in having to act in self-defense." (*Lasko, supra*, 23 Cal.4th at p. 108.)

16

156 Cal.App.4th 561, 571; see also *People v. Morales* (2021) 69 Cal.App.5th 978, 988.)

Using CALCRIM No. 505, the trial court instructed the jury, "The defendant is not guilty of manslaughter if he was justified in killing someone in self-defense or defense of another. The defendant acted in lawful self-defense or defense of another if: [¶] 1. The defendant reasonably believed that he or Colin Hendricks was in imminent danger of being killed or suffering great bodily injury. [¶] 2. The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger. [¶] AND [¶] 3. The defendant used no more force than was reasonably necessary to defend against that danger."

CALCRIM No. 505, as given to the jury here, also provides: "Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of death or great bodily injury to himself or someone else. Defendant's belief must have been reasonable and he must have acted only because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the killing was not justified.

"When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

17

"The defendant's belief that he or someone else was threatened may be reasonable even if he relied on information that was not true.  However, the defendant must actually and reasonably have believed that the information was true.

"If you find that the defendant knew that Kristian Ramos had threated or harmed others in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable.

"Someone who has been threatened or harmed by a person in the past is justified in acting more quickly or taking greater self-defense measures against that person.

"A defendant is not required to retreat.  He or she is entitled to stand his or her ground and defend himself or herself and, if reasonably necessary, to pursue an assailant until the danger of death or great bodily injury has passed.  This is so even if safety could have been achieved by retreating.

"*Great bodily injury* means significant or substantial physical injury.  It is an injury that is greater than minor or moderate harm.

"The People have the burden of proving beyond a reasonable doubt that the killing was not justified.  If the People have not met this burden, you must find the defendant not guilty of manslaughter."

### 2.  *Analysis*

After hearing testimony from eyewitnesses, the deputy medical examiner, and Flores, and watching the last moments of the altercation unfold on Smagin's cell phone video, the jury rejected Flores's theory that he acted in reasonable self-defense (or defense of Hendricks).  On appeal, Flores asks us to reweigh

18

the evidence and reappraise the credibility of his testimony, which we are not permitted to do under our standard of review.

The evidence demonstrates Ramos was the aggressor, and his attacks on Flores and Hendricks were unprovoked and persistent. But these factors are not determinative of lawful self-defense or defense of another under the applicable legal framework. Here, the jury was tasked with determining if (1) Flores reasonably believed that he or Hendricks was in imminent danger of being killed or suffering great bodily injury; (2) Flores reasonably believed that the immediate use of deadly force was necessary to defend against that danger; and (3) Flores used no more force than was reasonably necessary to defend against that danger. (CALCRIM No. 505.)

Substantial evidence and reasonable inferences from the evidence support a finding that Flores did not act in lawful self-defense or defense of Hendricks. Throughout the six-to-eight-minute altercation, Flores was able to overpower Ramos by pushing him to the ground multiple times. At one point, Flores and Hendricks pinned Ramos to the ground, and Ramos was unable to get up again until Flores and Hendricks released him. Thereafter, Ramos agreed to stop fighting but then "sucker punched" Flores on the nose. Flores pulled out the knife. As shown in the video, the next time Ramos charged at Flores, Flores easily tossed him to the ground. Ramos came up swinging, Flores attempted to push him away, and they both went down to the ground. Flores testified that he wound up on top of Ramos with his knees around Ramos's torso. He immediately used deadly force. There was sufficient evidence for a jury to conclude that use of deadly force was not *necessary* at that point to subdue Ramos, and a belief to the contrary was unreasonable. Ramos

19

was on the ground with Flores's full weight on top of him. Flores could have once again enlisted Hendricks's help to pin Ramos's arms down to prevent Ramos from punching or grabbing him. The three men could have immobilized Ramos and called the police. Instead, Flores used deadly force.

Even assuming for purposes of argument that Flores reasonably believed immediate use of deadly force was necessary to defend against the danger Ramos presented, substantial evidence supports a finding that Flores used excessive force. Ramos was attacking Flores and Hendricks with his fists. As reflected in photos shown to the jury, Flores sustained minor injuries—a cut on his lip and some bruising on his lip and face. On the other hand, Flores inflicted three separate fatal wounds to Ramos's neck with a sharp fishing knife, in addition to five other nonfatal knife wounds. Substantial evidence demonstrates that Flores used more force than was reasonably necessary to defend against Ramos's attack.

Flores told detectives he felt like he " 'had to take back control' " and stop Ramos. It is understandable that he wanted the unprovoked assault and taunting to end. However, substantial evidence supports a finding that he did not act in lawful self-defense or defense of Hendricks when he inflicted multiple fatal knife wounds while Ramos was lying beneath him unarmed.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED

M. KIM, J.

We concur:

ROTHSCHILD, P. J.

WEINGART, J.